## HUNT v. DETROIT SULPHITE PULP & PAPER CO.

District Court, W. D. New York.

July 27, 1936.

Henry A. Constantine, of Niagara Falls, N. Y., and Saperston, McNaughtan & Saperston by Alfred M. Saperston, all of Buffalo, N. Y., for plaintiff.

Kenefick, Cooke, Mitchell, Bass & Letchworth (by Lyman M. Bass and William P. Stewart), all of Buffalo, N. Y., and Rockwell T. Gust, of Detroit, Mich., for defendant.

THOMAS, District Judge.

This is a suit brought by plaintiff to recover damages for the alleged breach of a certain contract. The principal facts are not seriously disputed.

The suit was first brought in the Supreme Court for Niagara county and later transferred to this court by defendant because of diversity of citizenship. The defendant is a corporation organized and existing under the laws of the state of Michigan, and the negotiations leading up to the execution of the contract in suit, as well as all work in connection with the execution of the same, was conducted by its president, William P. Holliday, who died in 1932.

For some years the Crittsinger Company, a corporation organized under the laws of the state of New York, was in the real estate business in Niagara Falls, and its business was conducted by its president, Burt C. Crittsinger, since the time of its organization. On March 27, 1925, William L. Hunt was appointed its receiver by the Supreme Court of the state of New York, and was by proper order of that court authorized and directed to bring this suit, which is the only substantial asset in the hands of the receiver.

Although the contract was dated April 2, 1923, and signed by the defendant on May 25, 1923, it did not become effective until June 6, 1923. The contract was between Burt C. Crittsinger, Inc., of Niagara Falls, N. Y., hereinafter called the ven-

dor, and the Detroit Sulphite Pulp & Paper Company of Detroit, Mich., hereinafter called the purchaser, whereby the vendor covenanted to convey to the purchaser the capital stock of two Canadian companies owned by it, together with title, held by these two companies, to 14,500 acres of land in certain townships in the province of Ontario, Canada, as shown by a compilation called Schedule A and annexed to the contract. The vendor further agreed that it would take immediate steps to acquire and cause to be conveyed to the purchaser, or its nominee, 32,000 acres of additional lands in the townships of Lennox and Nesbitt as described in Schedule B annexed to the contract, with the right of substituting for a portion thereof 5,000 acres from an area designated in the contract. The agreement also provided for the completion of title to 1,600 acres of lands in the township of Calder, Ontario. These lands were known as "Settler" lots, and differed from the 32,000 acres to be acquired, in that title to them could be acquired only by residence and a specified amount of improvement over a certain number of years, while those in the other townships were known as "Veteran" lots, having been awarded by the British government to veterans of the South African War and the Fenian Raid.

The total consideration to be paid by the defendant purchaser to the vendor was $537,500, installments of which were to be made against deliveries of various portions of the subject-matter: $75,000 upon delivery to the Montreal Trust Company of the shares of stock of the two Canadian companies and evidence of title to the property described in Schedule A; $20,000 upon acceptance and approval by the purchaser of title to 4,000 acres of land set forth in Schedule B; $220,000 upon acceptance and approval by the purchaser of title to an additional 4,000 acres described in Schedule B and the delivery to the purchaser by the Montreal Trust Company of the shares of stock of the two Canadian companies, and all evidence of title theretofore delivered to the Montreal Trust Company by the vendor; the balance of $222,500 to be paid in five equal consecutive installments of $20,000 each, upon the acceptance by the purchaser of title to successive blocks of 4,000 acres each, set forth in Schedule B, and the final payment of $122,500 to be made on the completion of the agreement and its full performance by the vendor, which, without dispute, was to include a final conveyance of 4,000 acres.

This schedule of payments, especially the stipulation for the final payment of $122,500, is of some importance in considering the present controversy, in that the plaintiff insists that the $102,500, not definitely allocated by the language of the contract to any particular portion of the subject-matter, was a suspended payment for the equity of the vendor in the two Canadian companies and the property owned by them described in Schedule A, retained for the payment of possible damages to the defendant through the default of the vendor, while the defendant, contending in a lengthy argument that the conveyances made were fully paid for and that the vendor profited amply thereby, asserts that the $102,500 was merely to assure the purchaser an objective of a solid block of lots.

Another feature of the contract is the provision, found in paragraph 15, that time is not of the essence but could be made so by written notice to the vendor addressed and mailed by registered mail to it at the city of Niagara Falls, N. Y., giving it six months in which to fully complete the agreement.

The most controversial and provocative portion of the contract, however, is paragraph 10, which provides in full as follows: "10.—Provided that in case of default by the Vendor of any term or provision of this Agreement, the Purchaser may at its option rescind this agreement and re-transfer to the present owners thereof the shares of capital stock in the said Companies and convey to the Vendor any and all lands or interests in lands conveyed to the Purchaser or its nominee upon repayment to the Purchaser of all sums of money paid on account of this agreement together with interest thereon at the rate of six per cent. (6%) per annum from the date of payment, together with all expenses of every kind, nature and description whatsoever which the Purchaser shall or may have suffered, been at or been put to in connection with or by reason of this agreement or of the searching of titles, registration fees or other transfer fees or of the operations of the said Companies, or either of them, or of the lands, or any of them, referred to or covered by this agreement, and that at the time of such retransfer of said shares the Companies shall own the interests in lands owned by them or either of them at the time of the transfer to the Purchaser, and the Purchaser will convey or cause to be conveyed to the Vendor

all of the lands and interest in lands conveyed to or received by it under this agreement and said Companies shall have no bonded or other indebtedness incurred since the transfer to the Purchaser or its nominee of the shares in question and that failing such payment upon tender of the retransfer of the shares of the capital stock of said Companies to the present owners thereof, and of the lands or interest in lands to the Vendor, the Purchaser shall be entitled, upon reasonable notice, to dispose of the same in such manner as it shall see fit and to repay itself all such sums, expenses and disbursements as are hereinbefore referred to, together with all expenses of sale, and after repayment thereof, to transfer and convey the surplus, if any, to the parties entitled thereto in full satisfaction and discharge of all and any liability on the part of the Purchaser under this agreement, or for or by reason of the manner of disposal of the assets of the said Companies, or either of them, or of the said lands or interests in lands, which shall be entirely in the discretion of the Purchaser, and in the event of a deficiency the Vendor covenants and agrees that it will pay to the Purchaser any such deficiency that may arise; but the Purchaser may, in its uncontrolled discretion and at its option, affirm the contract and in such event shall be entitled to deduct from the balance of the purchase price subject to the provisions of paragraph Eleven of this Agreement all such damages as it may suffer by reason of the Vendor's default in the premises and in addition may recover affirmatively any damages accruing to it over and above such residue of purchase price as said Purchaser may suffer by reason of such Vendor's default."

Performance of the contract, with some readjustments and delays, which were ignored and, therefore, not important here, was rather well on its way by the end of 1923. The vendor had delivered the shares of the stock of the two Canadian companies, its plant and equipment, and 142 lots out of the total of 292, and had received therefor the first three installments stipulated in the contract.

The vendor had contracted with one Colonel Robertson of Toronto, Canada, admittedly the leading dealer in these veteran lots, whose owners were scattered all over the world, to acquire lots within the area specified in the agreement involved in this action. Although the testimony reveals that Colonel Robertson, assisted by a capable secretary and pressed by the president of the vendor, did his utmost to secure lots as rapidly as possible, it was clear that it was inherently a slow and tedious process. It was, therefore, not entirely surprising that no veteran lots were delivered in 1924, and it was not until January, 1925, that the next block of lots was delivered and paid for.

When the plaintiff was appointed receiver of the vendor, he continued, with the aid of the president of the vendor, to carry on the performance of the contract. On May 18, 1925, however, the defendant, pursuant to the provisions of paragraph 15 of the contract, sent notices to the plaintiff and the vendor requiring the completion of the agreement within six months. Although the plaintiff contends that the effect of this notice was waived orally by the defendant, the conversation relied upon is not sufficiently explicit to warrant that interpretation.

Within the six months' period, in July, 1925, the plaintiff delivered and the defendant accepted and paid for six additional lots. After November 19, 1925, the defendant refused to accept any more veteran lots, although it did continue to work with the president of the vendor on the completion of title to the settler lots. By that date, the plaintiff and the vendor had delivered 173 lots, the shares of stock of the two Canadian companies, with the plant and equipment, and received therefor $339,584.33, leaving a balance of 119 lots due the purchaser and $197,915.67 still unpaid the vendor.

A large part of the testimony at the trial was devoted to the details of the settlor lot work, both before and after November 19, 1925. Plaintiff contends, in the event it should be determined that the provisions of paragraph 10 are not exclusive, that the acceptance of the settlor lot work, and the fruits thereof after that date, constituted a waiver of any default, while the defendant replies that the waiver was not properly pleaded, and that the work was done with Mr. Crittsinger, the president, personally, and not on behalf of either the plaintiff or the vendor.

It might reasonably be held that the amended pleadings are sufficient to support proof of a waiver and that the efforts of Mr. Crittsinger could not be regarded as done otherwise than on behalf of the plaintiff and the vendor, since there

was not even an assertion that he was to be compensated directly by the defendant, as might be expected if there were a new and separate arrangement with him. But it is unnecessary to pass upon that phase of the action, in view of the determination upon the principal question in this case, the interpretation of paragraph 10 of the contract.

Plaintiff has also charged the defendant with several instances of bad faith in the performance of the agreement. The most outstanding of these is defendant's activity in acquiring 13 lots in the townships of Lennox and Nesbitt during the period of the contract without notifying the plaintiff or the vendor of the acquisition or crediting it on the number of lots to be delivered under the contract. The impropriety of this conduct apparently lay in its effect on the limited area available to the vendor from which it might acquire lots. It is also unnecessary to pass · upon this and other allegations of bad faith on the basis adopted for the determination of this action.

The record covers a period of years, and includes intricate details and a mass of correspondence. Various technicalities and varying grounds for and against recovery have been set up; a complexity imposed by the zeal of counsel on both sides, stimulated no doubt by the substantial amount involved.

Essentially, however, the question revolves around the construction of the contract, particularly the interpretation to be given to paragraph 10.

As to this, plaintiff has maintained that the provisions of that paragraph are exclusive, and that, if there was no waiver of the default of the vendor in failing to complete the performance of the contract before ·the expiration of the six months' period on November 18, 1925, the defendant was bound either to rescind the agreement or to affirm it in accordance with the procedure set forth in the paragraph. Since it is obvious that no attempt was made to rescind, it is plaintiff's contention that the defendant, by its conduct, affirmed and was required to pay to the plaintiff the balance of the purchase price, although it was entitled to deduct therefrom such damages as it might have suffered by reason of the vendor's default. The only proof of damages to the defendant was that offered by the plaintiff as the average value of 119 undelivered lots. This value, as testified by experts, ranged from $500 to $800 per lot. Conceding the highest of these estimates as the value of each of the 119 undelivered lots, plaintiff is seeking to recover the sum of $102,715.67, computed by deducting $95,200 (119 lots at $800 per lot) from the balance of the purchase price, $197,915.67.

Defendant, on the other hand, opposes this interpretation of paragraph 10, and denies the right of the plaintiff to recover under any circumstances in this action. Defendant's arguments in support of its position are outlined in the remainder of this opinion.

■ There is, of course, no denial of the proposition that parties to a contract may provide their own and exclusive remedies for the breach thereof. Matter New York, L. & W. R. R. Co., 98 N.Y. 447; Thomson-Houston Electric Company of New York v. Durant Land Improvement Company, 144 N.Y. 34, 39 N.E. 7; McCready v. Lindenborn, 172 N.Y. 400, 65 N.E. 208.

■ Whether the particular clause relied upon as setting forth the exclusive remedy is to be so interpreted, depends not only upon the language and literal meaning of the words in that clause, for those may be subject to more than one interpretation, but upon the intent of the parties revealed by the instrument as a whole, the background of the contract when executed, the conduct of the parties, and the nature of the subject-matter involved. So far as there is any choice, the construction must be one which will be equitable rather than unreasonable. Fleischman v. Furgueson, 223 N.Y. 235, 239, 119 N.E. 400; Wigand v. Bachman-Bechtel Brewing Co., 222 N. Y. 272, 118 N.E. 618; Gillet v. Bank of America, 160 N.Y. 549, 55 N.E. 292; Pressed Steel Car Co. v. Eastern Ry. Co. of Minnesota (C.C.A.) 121 F. 609.

■ The intensity of the controversy demonstrates that the language of paragraph 10 is not as explicit as it might be. It is sufficiently clear, however, to be consistent with the conclusion that the clause was intended to provide the exclusive remedies in the event of default by the vendor.

The defendant cites the case of Town of Tonawanda v. Stapell, Mumm & Beals Corporation, 240 App.Div. 472, 270 N.Y.S. 377, 378, affirmed 265 N.Y. 630, 193 N.E. 419, for the proposition that provision for exclusive remedies must be "clear and unmistakable." The language in the disputed

clause in that case reads: "The contractor further agrees to keep and maintain the pavement * * * together with its appurtenances in good condition and repair for one year from the date of the completion and acceptance of the same, in accordance with the conditions of the specifications and contract, without expense to the town."

It would require considerable liberality to interpret such a clause as expressing a provision for an exclusive remedy, since the language merely recites a further obligation on the part of the promissor. Yet even in that case the court reaches its determination by "construing the contract as a whole. * * *" In the instant case, the language of paragraph 10, beginning, "Provided that in case of default," clearly indicates a recital of remedies and not further obligations on the part of the vendor.

The defendant asserts that not only is the language not so "clear and unmistakable" as to support a construction of an exclusive remedy or of exclusive remedies, but that it fails to express any obligation on the buyer's part to make payments to the defaulting vendor. The defendant forgets that: "The law has outgrown its primitive stage of formalism when the precise word was the sovereign talisman, and every slip was fatal. It takes a broader view to-day. A promise may be lacking, and yet the whole writing may be 'instinct with an obligation,' imperfectly expressed." Wood v. Lucy, Lady Duff-Gordon, 222 N.Y. 88, 118 N.E. 214.

There is, of course, an explicit expression of an obligation to pay in that portion of paragraph 10 which refers to the procedure for rescission, providing for the transfer and conveyance of any surplus to the parties entitled thereto, after disposal of the assets previously received by the purchaser on the failure of the vendor to return payments made after tender.

Correspondingly implicit is the expression of the obligation to pay in the latter portion of the paragraph, which refers to the affirmance of the contract, providing for the deduction from the balance of the purchase price all such damages as might be suffered by reason of the vendor's default. Under defendant's interpretation of that phrase, it would have meaning only if the purchaser were behind in its payments. If that were true, the language would obviously have been, "shall be entitled to deduct from the installments due." Instead, it expressly provides, "shall be entitled to deduct from the balance of the purchase price."

The same values and damages necessarily existing whether the contract was rescinded or affirmed, it is clear that the predictive possibility of a surplus in the event of rescission carried with it the similar possibility of a surplus after deduction from the "balance of the purchase price" in the event of affirmance. The language is "instinct with an obligation" to pay in the event that on affirmance, a surplus does remain after the deduction of damages from the balance of the purchase price, for the purpose of such deduction could only be to ascertain the amount payable to the vendor.

Defendant's further objection to the construction of paragraph 10 as imposing an obligation to pay, if a surplus or a balance remains, is that prior paragraphs of the contract provide that payments of parts of the purchase price depend upon delivery of lots by the vendor. It argues that to admit the correctness of plaintiff's contention as to the meaning of the contract would require the omission of these other paragraphs. Paragraph 10, however, begins, "Provided that in case of default." In legal or common speech the word "provided" expresses a "qualification, a limitation, a condition or an exception respecting the scope and operation of words previously used." 50 C.J. 830.

Here the dependence of payments upon deliveries is definitely removed in the event of default by the vendor, and the obligation to pay the full purchase price is qualified by permitting the deduction of the purchaser's damages.

Since paragraph 10 expressly qualifies and supersedes, upon the default of the vendor, the scope of the prior provisions, its construction as an expression of the exclusive remedies and as imposing an obligation upon the purchaser in the event of its affirmance after default, to deduct its damages from the balance of the purchase price and to pay that balance to the vendor, is perfectly consistent with those prior provisions.

Defendant has also urged that paragraph 10 was designed solely to give purely optional remedies to the purchaser on default of the vendor. It reaches its conclusion by stating that the paragraph recites only the normal remedies given to the promisee upon breach of contract by the

promisor. This action, however, demonstrates that the defendant is relying upon another remedy, one which was not recited in the contract; the right to retain what it had received and make no further payments. This remedy, in view of the nature of the whole contract, must have been recognized as an actual possibility in the event of default. Its inclusion, as a right belonging to the defendant, could have easily been accomplished without prolonging an already lengthy paragraph by stipulating that the purchaser might, in its discretion, adopt neither of the remedies theretofore expressed. The exclusion of that remedy was obviously a limitation on the purchaser's rights in the event of default by the vendor. This seems to be another indication that the choice of remedies was intended to be limited to those expressed in paragraph 10.

The nature of the contract is also such that a provision for exclusive remedies would be almost essential for the protection of the vendor in the event of its default. The vendor covenanted that it "will take immediate steps to acquire and cause to be conveyed to the purchaser or its nominee thirty-two thousand (32,000) acres of additional lands" "as soon as possible." This was in addition to the conveyance of the capital stock of the two Canadian companies, the mill, plant, and equipment, and the 14,500 acres of land listed in Schedule A. Both parties knew at the time the contract was executed that the original grantees or their descendants, devisees, and assigns as the owners of the lots listed in Schedule B were scattered over all the world, and the defendant had been notified that the vendor had a contract with Colonel Robertson to obtain those lots, which contract was to run for a period of at least two years.

It must have been acknowledged that some of the 200 lot owners might be unreasonable in their demands or unwilling to sell. A substitution area of 5,000 acres or 31 lots was, it is true, provided for, but there could have been no assurance that more than 31 owners might not refuse to transfer their property. The vendor had neither the sovereign power of eminent domain, nor the divine power of dictating the desires of obstinate landowners. The failure of Colonel Robertson, the same agent as used during the performance of this contract by the vendor and plaintiff, to acquire more than 77 lots, 10 of which he already had in January, 1926, in the townships of Lennox and Nesbitt during the five years from 1926 to 1931, in which he worked directly for the defendant, is a corroborative reflection of the foreseeable inherent difficulty of performance. There was no contradiction at the trial of the diligent, sincere efforts of the vendor and the plaintiff, through Colonel Robertson, their agent, to complete performance as rapidly as possible.

The difficulty of performance was fully anticipated, and yet paragraph 15 of the contract permitted the purchaser to require complete performance of the agreement within six months after notice. As defendant points out, the motive or reason for exercising this right had no bearing upon its effectiveness. It is only logical, therefore, that to counterbalance this absolute right which the defendant had reserved, and a possible unfair exercise of it, provision was made for exclusive remedies in paragraph 10.

The importance of such protection is to some extent dependent upon an estimation as to the character of the $102,500 included in the last payment of $122,500. While the plaintiff makes no claim that this amount represents profit on the lots in Schedule B, the defendant rebuts the possibility of any such argument. The principal dispute is as to whether the amount represents the equity of the vendor in the two Canadian companies and the property described in Schedule A, or whether it was merely a bonus to assure the purchaser an objective of a solid block of lots.

By comparing the value of the individual lots in Schedule A with those in Schedule B, defendant reasons that the vendor was fully paid for the land included in Schedule A. Yet it asserts that $102,500 was to be paid to assure the purchaser the acquisition of a solid block of 292 lots. Certainly, if that argument were valid, then the original block of 92 lots because of its size, controlling the situation on the Driftwood river, was worth considerably more than the per lot analysis would reveal.

The defendant also determines the value of the mill, lot, plant, and equipment to be far below the amount paid by the defendant in the installments at the time this property was delivered. While no definite proof of the value of this property was offered, especially since, under plaintiff's theory that paragraph 10 provided the exclusive remedies, such proof was unnecessary, oth-

er factors inferable from the entire testimony and correspondence justify the assumption that the property conveyed was worth considerably more than the payments made by the defendant.

The protracted negotiations leading to the drafting of the contract, the careful cruise of the property prior to the signing of the agreement, the ability of both Mr. Holliday, president of the defendant, and Mr. Crittsinger, president of the vendor, as shrewd traders, would indicate that, regardless of what situation might actually be revealed later, the defendant considered the property in Schedule A and the shares of stock in the two corporations to be sufficiently valuable to warrant payment of a large amount at the beginning of performance. It was apprised of the precarious financial condition of the Crittsinger Company, and, therefore, undoubtedly required retention of a considerable portion of the purchase price, represented by these original deliveries, as security for performance. Furthermore, Plaintiff's Exhibit 12, a map attached to the original contract, reveals what must have been recognized as the peculiar value of the mill lot. It is the only lot which controls the junction of the transcontinental railroad and the Driftwood river, an item that would seem to be of special importance in a venture of this sort.

Defendant's characterization of the $102,500 as a "bonus" for the acquisition of a complete block of lots might conceivably result in its assuming the nature of a penalty for the defendant might serve its six months' notice to complete just after all but the last block of lots had been delivered. If in that six months' period the vendor had collected all but the last five lots of a block of twenty-five, and if the defendant's contention that paragraph 10 was not exclusive, were true, the vendor would forfeit the entire bonus, which would then in fact become a threat or a penalty against incomplete performance. Proper estimation, therefore, of this disputed sum is that it is a portion of the equity retained by the defendant as security against which it might charge whatever damages it might incur through the vendor's default.

In view of the nature of the contract and the probability that a portion of the equity of the vendor had been retained by the defendant, the only interpretation consonant with reason is that paragraph 10 was intended and did provide the exclusive remedies in the event of default by the vendor. Any other interpretation would impose a forfeiture and give one of the parties an unreasonable advantage over the other.

Despite the defendant's contention to the contrary, a construction of the paragraph as providing exclusive remedies does not put the purchaser at the mercy of the vendor, nor impose any penalties upon the former. It was amply protected in that paragraph by its option to select the remedy by rescission. Although the Crittsinger Company was heavily indebted at the time of the execution of the contract, still the parties were apparently fully confident that there was an available market at that time for all the property. This is indicated by the provision for the rebate of any surplus after the resale of the property in the event the vendor failed to return the payments made on tender of the property previously delivered.

If the paragraph were not to provide exclusive remedies, there would have been no need for a provision requiring the return of a surplus, for the defendant, if it did not desire to retain the property and foresaw that it might sell at a profit, would not be required to and would not rescind, but would sell the assets on its own account and retain any surplus. Though the defendant asserts that the possibility of rescission never existed as a fact, there is the actual testimony of Mr. Crittsinger that in January, 1926, he suggested to Mr. Holliday that he tender back the property received as Mr. Crittsinger had a prospect who desired to purchase it. According to the testimony, Mr. Holliday refused to consider the proposition.

Defendant also intimates that rescission was not attempted, and that no action was taken to recover damages from the vendor because of the expense which would be involved in such an attempt and the lack of assets to satisfy a judgment if obtained. This, however, should not have prevented the defendant from setting up a counterclaim and proving its actual damages in this action if those damages were greater than the value of the undelivered lots.

Defendant's further objection to this interpretation of paragraph 10 is that it would give the party who has broken the contract the right to recover upon it. One of the cases cited by it for this statement is Witherspoon v. Choctaw Culvert & Machinery Co. (C.C.A.) 56 F.(2d) 984. In that case, however, the breach which pre-

vented the plaintiff from recovery was its failure to pursue the remedies specified in the contract. There the agreement for the sale of certain machinery provided that, upon the failure of the purchaser to make regular payments, it could require the seller to rent the machinery on its behalf. Instead of pursuing that remedy, the seller was attempting to replevin the machinery.

In other cases cited by the defendant, the wrong of the plaintiff and attempt to recover on the contract thereafter would have left the defendants in those cases without any remedy. In this action the defendant had ample opportunity to protect itself by exercising its option to rescind the contract.

Furthermore, the nature of the default should have some bearing upon the adjudication and recovery. In the present situation, it was anticipated that the default would not involve, and it actually did not involve, any willfullness or neglect on the part of the vendor or the plaintiff, but was the result of the foreseeable difficulty of performance, despite all reasonable efforts to acquire lots. The vendor could not have profited by a willful default, not only because a portion of the equity had been retained as security for performance, but also because the purchaser could have prevented this by exercising its option to rescind the contract.

While the law will not ordinarily permit a recovery by a wrongdoer, it is opposed to penalizing one whose default has occurred despite the utmost good faith and reasonable efforts to perform. An indication of this is the development of the rules for recovery for substantial performance and in quasicontract actions.

In accordance with these conclusions, it was logical and reasonable for the parties to have stipulated exclusive remedies in the event of default by the vendor, especially where the nature of the default would in all probability be such that though it might be substantial, it would not, in a malicious sense, be wrongful.

Since paragraph 10 does provide the exclusive remedies in the event of default by the vendor, and since such default occurred on November 18, 1925, that paragraph became operative on that day. The defendant was given the option and choice between rescission and affirmation, with their respective obligations and rights. It did not exercise its option to rescind, but, on the contrary, by its conduct must be held to have affirmed the contract and assumed the obligations to account to the plaintiff for the balance of the purchase price after deducting the damages it may have suffered by reason of the default.

Judgment may, therefore, be entered in favor of the plaintiff for the sum of $102,715.67, being the balance of the purchase price on November 19, 1925, to wit, $197,915.67, less the only damages to the defendant proved upon the trial of this action, $95,200, the total of the average value of $800 per lot for the 119 undelivered lots, plus interest at 6 per cent. from November 19, 1925. The above and foregoing constitutes the necessary findings of fact and conclusions of law.

Submit order accordingly, properly consented to as to form.